# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Cully Chapple,

                 Plaintiff,

     v.

Waste Management, Inc. and
Waste Management of Minnesota,
Inc.,

                 Defendants.

**MEMORANDUM OPINION
AND ORDER**
Civ. No. 05-2583 ADM/JSM

---

Brian E. Cote, Esq., Cote Law Firm, Ltd., Minneapolis, MN, argued on behalf of Plaintiff.

Marko J. Mrkonich, Esq. and Bryan N. Smith, Esq., Littler Mendelson, P.C., Minneapolis, MN, argued on behalf of Defendants.

---

## I. INTRODUCTION

On November 30, 2006, oral argument before the undersigned United States District Judge was heard on Defendants Waste Management, Inc. and Waste Management of Minnesota, Inc.'s (collectively "Waste Management") Motion for Summary Judgment [Docket No. 23]. In his Complaint [Docket No. 1], Plaintiff Cully Chapple ("Chapple") asserts claims for disability discrimination and failure to make reasonable accommodation in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112(a), (b)(5)(A), and the Minnesota Human Rights Act ("MHRA"), Minn. Stat. § 363A.08, subds. 2, 6.[1] For the reasons stated herein, Waste Management's Motion for Summary Judgment is granted.

---

[1] Chapple concedes dismissal of other claims asserted in his Complaint. See Am. Mem. in Opp'n to Mot. to Dismiss [Docket No. 52] at 2 n.1-2, 3 n.3.

## II. BACKGROUND[2]

### A.   Chapple's Duties as a Bulk Driver for Waste Management

Waste Management provides solid waste collection, recycling, and disposal services to homes, businesses, and municipalities.  Smith Aff. [Docket No. 25] Ex. A.  The company operates nationwide, including in Minnesota.  Id.; Gonzalez Dep. (Smith Aff. Ex. C; Cote Aff. [Docket No. 54] Ex. FF) at 7.

In June 2001, Chapple began employment as a residential bulk driver for Waste Management's Blaine, Minnesota facility.  Chapple Dep. (Smith Aff. Ex. B; Cote Aff. Ex. EE) at 8, 11.  Chapple's assignment was to drive a commercial waste truck and collect large refuse items, including sofas and mattresses, from residences in the eastern Twin Cities metro area.  Id. at 11.  Although primarily a bulk driver, Chapple also worked occasionally as a dispatcher and as a safety book rules trainer.  Id. at 12-13; Sartell Dep. (Smith Aff. Ex. D) at 16-17.  Forrest Sartell ("Sartell"), then a Residential Manager at the Blaine facility, supervised Chapple during the entire period of Chapple's employment.  Sartell Dep. at 14, 16.

### B.   Diagnosis of Lymphedema; Leave of Absence

Shortly before September 4, 2003, Chapple received a minor cut, "less than a pinky nail wide," on his left leg while working.  Chapple Dep. at 24.  Because such cuts were common, and he was unconcerned at the time, Chapple waited until the evening to wash the cut and apply a band-aid.  Id. at 25.  On September 4, Chapple experienced uncontrolled shivering while driving his garbage truck "and within the space of a few hours was very close to death."  Id. at 22-23.

---

[2] On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party.  Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995).

Chapple called 911 and an ambulance arrived and took him to the hospital.  Id.  Doctors determined that Chapple had an infection in his left leg, which within a few hours "you could literally see racing up [Chapple's] leg."  Id. at 26.  At one point Chapple's entire leg was red and swollen, and the doctors considered amputation.  Id.  Fortunately, an infection specialist treated Chapple with experimental antibiotics.  Id. at 27.  Within four to eight hours, Chapple's condition stabilized and he started to recover.  Id.

Chapple remained in the hospital for about a week.  Id.  His leg remained permanently larger than it was before the incident.  Id.  Chapple was diagnosed with lymphedema in his left leg.  Lymphedema occurs when lymph vessels are unable to drain lymph fluid from a person's arm or leg.  Cote Aff. Ex. KK at 1.  Complications from lymphedema include infections in the affected limb, and elephantiasis, which occurs when the affected limb becomes so hardened with thickened skin that it is difficult to move.  Id. at 4.  Chapple believes that the removal of a vein from his left leg during a triple bypass surgery in February 2002 caused his lymphedema.  Chapple Dep. at 8, 23-24.

On September 5, 2003, Chapple notified Waste Management that he needed a leave of absence to undergo treatment for his condition.  Gonzalez Aff. [Docket No. 26] Ex. C.  Waste Management received a doctor's note dated September 11 indicating that Chapple "is to rest and elevate leg until next visit 9-19-03 when we will reassess."  Chapple Dep. Ex. 16.  On September 12, Human Resources Coordinator Stephanie Love ("Love"), who reported to Senior Human Resources Manager Rodrigo Gonzalez ("Gonzalez"), wrote a letter advising Chapple that he was eligible for twelve weeks of leave under the Family and Medical Leave Act ("FMLA").  Gonzalez Aff. Ex. C.  The letter stated that Chapple was required to provide Waste Management

with medical certification of a serious health condition by September 30, 2003, or his FMLA benefits might be delayed.  Id.  Although Chapple never provided such a certification to Waste Management, Waste Management paid FMLA benefits to Chapple.  Love Dep. (Smith Aff. Ex. G; Cote Aff. Ex. GG) at 43, 75.  Chapple also began receiving short term disability benefits under Waste Management's short term disability plan.  Chapple Dep. at 103.

For the remaining months of 2003, Chapple was unable to return to work and received treatment for his lymphedema.  Id. at 56.  On December 17, 2003, Michael Pinchback, M.D. ("Pinchback"), who was Chapple's physician, signed a statement of disability indicating the following limitations on Chapple's activities: cannot stand, walk or sit for more than two hours; no lifting, pushing, or pulling objects heavier than ten pounds; and no driving long distances.  Id. Ex. 25.

On December 2, 2003, Waste Management sent Chapple a letter notifying him that he had exhausted his twelve weeks of FMLA leave, and therefore Waste Management could not guarantee that he would be reinstated to the same or an equivalent job.  Love Dep. Ex. 5. Chapple's short term disability benefits ended on January 1, 2004.  Chapple Dep. at 103, Ex. 22.

## C.    Consideration of Chapple for Reassignment to Vacant Positions

On January 2, 2004, Pinchback cleared Chapple to return to work with the following restrictions: no bending, squatting, or kneeling; no lifting or carrying more than ten pounds; no extreme temperatures; and hourly positional changes between sitting and standing.  Id. Ex. 27. Chapple could perform up to eight hours of tasks involving twisting/turning, reaching above his shoulders, and reaching below his knees.  Id.  Chapple advised Sartell by phone of his work limitations.  Sartell Dep. at 25-26; Gonzalez Dep. at 34-43.  It is unclear whether Chapple

4

provided copies of these limitations to Sartell.  Chapple concedes that he was unable to return to his position as a bulk driver.  Chapple Dep. at 20, 50.  Instead, Chapple expressed interest in reassignment to other positions, including cart delivery, scale attendant/operator, customer service representative, sales, and dispatcher.  Sartell Dep. at 31, 37.

Sartell determined that the cart delivery and dispatch positions, which were within his supervisory authority, were not viable reassignment options because they were fully occupied. Id. at 38.  However, in January and February 2004, Waste Management had vacancies in the scale attendant and customer service representative positions.  Chapple Dep. Exs. 29, 33.

Waste Management's Employee Handbook states that "[a]ll full-time exempt, salaried non-exempt, and exempt positions up to the General Manager level and below will be posted both internally and may be posted externally."  Gonzalez Aff. Ex. A at 16.  Additionally, "[i]f an internal and external applicant are equivalent in terms of qualifications and fit for an open position, preference will be given to the internal candidate."  Id.

### 1.       Scale Attendant Position

On January 12, 2004, Debra Walters ("Walters"),[3] the District Manager for Waste Management's landfill in Elk River, Minnesota, emailed Love to advise her of a vacancy for the Scale Attendant position.  Walters Dep. (Smith Aff. Ex. E; Cote Aff. Ex. II) at 7, 35-37; Chapple Dep. Ex. 29.  That same day, Love forwarded the email to Sartell, who forwarded it to Chapple. Chapple Dep. Ex. 29.  Waste Management also posted the job opening online in Minnesota's Job Bank.  Id. Ex. 30.

---

[3] At the time, she was known as Debra Dehn.  To avoid confusion, she will be referred to here as "Walters."

5

The Scale Attendant position involves operating a scale to weigh vehicles arriving at and departing the landfill, interacting with the general public, collecting cash from customers, and entering data into a computer to track daily activity.  Id. Ex. 28; Walters Dep. at 22.  Chapple viewed Waste Management's internal job posting form, which lists the following minimum requirements for the job: high school diploma or equivalent; cashier experience; drug testing; and the ability to stand for long periods of time.  Chapple Dep. at 109, Ex. 28.  Additionally, a list of preferred characteristics is provided, including computer, cashier, ten key, and customer service skills.  Id. Ex. 28.

On January 13, 2004, Chapple went to the Elk River scale and submitted an application and resume to Debra Walters.  Id. Ex. 31.  Having delivered many hauls to the Elk River scale, Chapple considered himself "very familiar" with the duties of a Scale Attendant and was confident he could do the job with his work restrictions.  Id. at 15-16.  Walters was busy that day, so Chapple briefly told her he was applying for the job, and that he had medical restrictions, which were attached to his application.  Id. at 59.  Walters indicated that Chapple would be contacted if selected for the position.  Id.  Finding Chapple not as qualified as other applicants, Walters did not interview Chapple for the position.  Walters Dep. at 79.  After interviewing six to eight candidates, Walters selected Kittrie Kelley, an external applicant who had previous cashier experience.  Id. at 63-64, Ex. 6.

## 2.    Customer Service Position

In late February 2004, Sartell notified Chapple of vacancies in the Customer Service Representative ("CSR") position at Waste Management's Blaine facility.  Chapple Dep. at 60-61.  The CSR position entailed answering incoming phone calls in a call center.  Cote Aff. Ex.

NN.  Waste Management's internal job posting form lists one year of customer service or related experience as a minimum requirement.  Id.  Chapple traveled to the Blaine facility and submitted an internal application form for the CSR position on March 1, 2004.  Chapple Dep. Ex. 35.  The form states Waste Management's policy that "[t]he most qualified applicant (internal or external) will be chosen for the position."  Id.

That same day, Jennefer Klennert ("Klennert"),[4] Municipal Marketing Manager, interviewed Chapple for the CSR position.  Klennert Dep. (Smith Aff. Ex. F; Cote Aff. Ex. HH) at 58; Chapple Dep. at 61.  Based on Chapple's description of his limitations, Klennert determined that the CSR position could accommodate Chapple's work restrictions.  Klennert Dep. at 65.  However, Klennert recorded in her interview notes that Chapple had "limited experience over phones" and had "no true call center exp[erience]."  Id. Ex. 1.  After interviewing other applicants, Klennert determined that Chapple was "qualified but not the most qualified" for the CSR position.  Id. at 68, Ex. 7.  After confirming with Gonzalez that Waste Management's policy was to hire the most qualified candidate, Klennert offered the CSR positions to Kimberly Gibson, who had eight months of call center experience, and Lori Struckman, who had 16 months of call center experience.  Id. at 68-69, 74, Exs. 2, 4.

D.      **Chapple's Termination and Subsequent History**

On March 4, 2004, Gonzalez instructed Love to obtain Chapple's work restrictions.  Id. Ex. 8.  Sometime around March 4, 2004, Love prepared a chronology of events regarding Chapple since he last worked on September 4, 2003.  Gonzalez Dep. at 51, Ex. 2.  The

---

[4] Klennert's formal surname is "Hunt."  To avoid confusion, she will be referred to here as "Klennert."

chronology indicates that "[i]f not hired into Customer Service, there are no other available positions Cully is qualified for at this time and he should be administratively terminated." Id. Ex. 2.  Subsequently in March 2004, Chapple called Sartell to discuss the fact that he had applied but not been hired for the two positions.  Sartell Dep. at 44-46.  Chapple asked if he was being "black-balled," and specifically named Irv Hofstead ("Hofstead"), Operations Manager at the Blaine facility.  Id.  Sartell discussed Chapple's concerns with Hofstead, and with Gonzalez.  Id. When Chapple was not selected for the CSR position, Gonzalez and Sartell decided to terminate Chapple's employment because he had exhausted his FMLA and short term disability benefits, and Sartell did not foresee any job vacancies on the horizon for Chapple.  Id. at 56.  On March 19, 2004, Waste Management terminated Chapple's employment by mailing him a severance agreement.  Am. Mem. in Opp'n to Summ. J. at 29.  The record does not reflect that Waste Management's Human Resources department ever received a copy of Chapple's work restrictions.[5]

After he was terminated by Waste Management, Chapple worked for approximately one year as a school bus driver.  Chapple Dep. at 40, 51.  Chapple eventually quit this job in July 2005 because it became too painful to drive for extended periods without taking pain-killers.  Id. at 40-41.

---

[5] Pinchback signed a report of work ability on March 11, 2004.  Chapple Dep. Ex. 36. The limitations were identical to the January 2 restrictions except for the addition of "avoidance of infection risk."  Id.

## III. DISCUSSION

### A.      Summary Judgment Standard of Review

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall issue "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); see Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party.  Ludwig, 54 F.3d at 470.  The nonmoving party may not "rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial."  Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

### B.      Disability Discrimination

The ADA and MHRA prohibit discrimination in employment on the basis of disability.  42 U.S.C. § 12112(a); Minn. Stat. § 363A.08, subd. 2.  To proceed on a cognizable disability discrimination claim, Chapple must first establish a *prima facie* case of discrimination by showing that (1) he is disabled under the ADA, (2) he is qualified to perform the essential functions of his job with or without reasonable accommodation, and (3) he suffered an adverse employment action under circumstances giving rise to an inference of unlawful discrimination based on disability.  Heisler v. Metro. Council, 339 F.3d 622, 626-27 (8th Cir. 2003).  If Chapple establishes a *prima facie* case, the burden of production shifts to Waste Management to articulate a legitimate, nondiscriminatory reason for its actions.  Kiel v. Select Artificials, Inc., 169 F.3d

1131, 1135 (8th Cir. 1999).  Once Waste Management has done so, the burden shifts back to

Chapple to present evidence that Waste Management's legitimate nondiscriminatory reason is

mere pretext.  Id.  The MHRA generally parallels the ADA, and consequently, ADA and MHRA

claims are analyzed under the same standard.  Kammueller v. Loomis, Fargo & Co., 383 F.3d

779, 784, 788 (8th Cir. 2004); Fenney v. Dakota, Minn. & E. R.R. Co., 327 F.3d 707, 711 n.5

(8th Cir. 2003).

  **1.**  **Disability**

  To be disabled under the ADA, an individual must: (1) have a physical or mental

impairment that substantially limits one or more major life activities; (2) have a record of such

an impairment; or (3) be regarded as having such an impairment.  42 U.S.C. § 12102(2).  The

MHRA similarly defines disability, except the word "materially" is substituted for the word

"substantially."  Minn. Stat. § 363A.03, subd. 12.  Chapple does not argue that he has a record of

disability or that Waste Management regarded him as disabled.  Therefore, to establish his *prima*

*facie* case Chapple must raise a genuine issue of fact that he is disabled.

  Agency regulations that interpret the ADA define "substantially limits" as "[u]nable to

perform a major life activity that the average person in the general population can perform" or

"[s]ignificantly restricted as to the condition, manner or duration under which an individual can

perform a particular major life activity as compared to the condition, manner, or duration under

which the average person in the general population can perform that same major life activity."

29 C.F.R. § 1630.2(j)(1); Ristrom v. Asbestos Workers Local 34 Joint Apprentice Comm., 370

F.3d 763, 769 (8th Cir. 2004).  The Supreme Court defines "substantially" to mean

"'considerable' or 'to a large degree.'"  Toyota Motor Mfg. v. Williams, 534 U.S. 184, 196

(2002).  Factors to consider in determining whether an individual is substantially limited in a major life activity are "(1) [t]he nature and severity of the impairment; (2) [t]he duration or expected duration of the impairment; and (3) [t]he permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment."  29 C.F.R. § 1630.2(j)(2); Heisler, 339 F.3d at 627.

Agency regulations define "major life activities" as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i).  The Supreme Court defines "major life activities" as "those activities that are of central importance to daily life."  Toyota, 534 U.S. at 197.  Whether or not an individual is disabled is determined on a case-by-case basis.  Id. at 198.  The effects of any mitigating measures utilized by the individual must also be taken into account.  Sutton v. United Air Lines, Inc., 527 U.S. 471, 482 (1999).

Chapple's physical limitations in March 2004 are summarized in the work limitations issued by Pinchback as: no bending, squatting, or kneeling; no lifting, pushing, pulling, or carrying more than ten pounds; no extreme temperatures; no driving long distances; no more than eight hours of tasks involving twisting/turning, reaching above his shoulders, and reaching below his knees; hourly positional changes between sitting and standing; and avoidance of infection risk.  Additionally, Chapple has testified that he limps and that "[w]alking much more than a block at a time and my leg begins to hurt really bad."  Chapple Dep. at 33.  Further, Chapple has difficulty walking up and down stairs.  Id. at 38-39.  Based on these limitations, Chapple contends that his "lymphedema substantially limits the major life activities of walking, standing, driving, sitting, lifting, and caring for his children."  Am. Mem. in Opp'n to Mot. for

Summ. J. at 44.[6]

### a.      Walking

Walking is a major life activity.  See Weber v. Strippit, Inc., 186 F.3d 907, 914 (8th Cir.

1999).  Defendants cite Chapple's testimony that he runs errands for his family, does the grocery

shopping, and participates in political activities as evidence that he is not substantially limited in

his ability to walk.  Chapple Dep. at 33, 38.  Defendants characterize Chapple's limitation as an

inability to walk for extended periods, which is not a substantial limitation under Eighth Circuit

precedent.  See Weber, 186 F.3d at 914; Kelly v. Drexel Univ., 94 F.3d 102, 106 (3d Cir. 1996)

(plaintiff testified that he could not walk more than a mile).  However, Chapple testifed that he

can not walk more than one block without experiencing a great deal of pain, and that he rides a

cart when at places such as the Mall of America, IKEA, or the zoo.  Chapple Dep. at 33.  If

Chapple can walk for only very brief periods of time, then his ability to walk may be

substantially limited.  See Ross v. Alegent Health, 380 F. Supp. 2d 1029, 1036 (S.D. Iowa 2005).

There is a genuine issue of material fact regarding whether Chapple is substantially limited in the

major life activity of walking.

### b.      Sitting and Standing

It is unclear whether sitting and standing, by themselves, are major life activities.

Compare Philip v. Ford Motor Co., 328 F.3d 1020, 1023 (8th Cir. 2003) (stating that sitting and

standing are major life activities) with Nuzum v. Ozark Auto. Distrib., 432 F.3d 839, 845 (8th

Cir. 2005) (suggesting a plaintiff must show how sitting and standing limitations impact tasks

---

[6] Chapple also presents Dr. Pinchback's expert conclusion that Chapple is substantially limited in these activities.  Cote Aff. Ex. DD.  However, Dr. Pinchback's report is conclusory and therefore is of little value.  See Ristrom, 370 F.3d at 769.

central to most people's daily lives). As of March 2004, Chapple required hourly positional changes between sitting and standing. Courts have determined that identical restrictions are not substantial limitations. For example, the Fifth Circuit has held that a plaintiff's "ability to sit or stand in one place for up to one hour at a time before having to walk around makes clear that the 'condition, manner, or duration' under which she was able to sit or stand was not significantly restricted as compared to the average person." Dupre v. Charter Behavioral Health Sys. of Lafayette Inc., 242 F.3d 610, 614 (5th Cir. 2001); see also Taylor v. Pathmark Stores, Inc., 177 F.3d 180, 186 (3d Cir. 1999). Assuming arguendo that sitting and standing are major life activities, Chapple's limitations are not substantial as a matter of law.

### c. Driving

At least three courts of appeals have held that driving is not a major life activity. See Robinson v. Lockheed Martin Corp., No. 06-1704, 2007 WL 38345, at *2 (3d Cir. Jan. 8, 2007); Chenoweth v. Hillsborough County, 250 F.3d 1328, 1329-30 (11th Cir. 2001); Colwell v. Suffolk County Police Dep't, 158 F.3d 635, 643 (2d Cir. 1998). The Eleventh Circuit has reasoned that:

> It would at the least be an oddity that a major life activity should require a license from the state, revocable for a variety of reasons including failure to insure. We are an automobile society and an automobile economy, so that it is not entirely farfetched to promote driving to a major life activity; but millions of Americans do not drive, millions are passengers to work, and deprivation of being self-driven to work cannot be sensibly compared to inability to see or to learn.

Chenoweth, 250 F.3d at 1329-30. The Eighth Circuit has yet to decide whether driving is a major life activity. See Anderson v. N. Dakota State Hosp., 232 F.3d 634, 636 (8th Cir. 2000) ("While working is clearly a major life activity, the matter of driving is not so obvious.").

Assuming that driving is a major life activity, the record does not support a finding that

13

Chapple's ability to drive was substantially limited when Waste Management terminated him in March 2004. Chapple worked for a year as a school bus driver after he was terminated by Waste Management. Although he eventually quit because driving extended periods was too painful, the fact that Chapple performed a driving job for a year fatally undermines his contention that his ability to drive was substantially limited when Waste Management terminated him. Moreover, Chapple testified that he does the majority of his family's grocery shopping and errands. Presumably Chapple drives to perform these tasks. In short, the record can not support a finding that Chapple's ability to drive is substantially limited.

**d.    Lifting**

Eighth Circuit case law clearly states that lifting "is not a major life activity in its own right." <u>Nuzum</u>, 432 F.3d at 845. Rather, lifting "is part of a set of basic motor functions that together represent a major life activity." <u>Id.</u> Chapple must show how limitations on his lifting ability and other basic motor functions affect his ability to perform particular tasks that are central to most people's daily lives. <u>Id.</u> Chapple has not demonstrated how his lifting restrictions have affected his life activities.

**e.    Caring for Children**

It is well established in the Eighth Circuit that caring for others is not a major life activity. <u>See</u> <u>Krauel v. Iowa Methodist Med. Ctr.</u>, 95 F.3d 674, 677 (8th Cir. 1996).

**2.    Qualifications to Perform Essential Functions**

Chapple must also establish that he was qualified to perform the essential functions of the job he had or desired. 42 U.S.C. § 12111(8). Chapple never sought to return to work as a bulk driver. Therefore, he must show he was qualified for the Scale Attendant and CSR positions he

14

sought.

### a.    Scale Attendant

Regarding the Scale Attendant position, Defendants argue that Chapple had no cashier experience, which was listed as a minimum requirement for the job.  In response, Chapple contends that he was familiar with a Scale Attendant's duties because he interacted with Scale Attendants during the course of his duties as a bulk driver.  However, regardless of how familiar Chapple may have been with the Scale Attendant position, he does not suggest that he had cashier experience, and he does not dispute that cashier experience was a legitimate prerequisite for the job.  Therefore, Chapple can not establish that he was qualified for the Scale Attendant position.

### b.    Customer Service Representative Position

There is a genuine issue of material fact as to whether Chapple was qualified for the CSR position.  Although Chapple did not have a year of customer service experience, which was a stated minimum requirement, Klennert determined that Chapple was qualified for the position.  Additionally, Klennert concluded that Chapple's work restrictions could be accommodated.  This evidence can support a finding that Chapple was qualified for the CSR position.

### 3.    Adverse Employment Action

Regarding the third element of a *prima facie* case of disability discrimination, Chapple must provide sufficient evidence that he suffered an adverse employment action under circumstances giving rise to an inference of discrimination.  Chapple's termination as a bulk driver was an adverse action.  However, Chapple provides no evidence giving rise to an inference of discrimination.  Again, Chapple admits he was unable to perform the bulk driver

job; therefore, he must provide evidence that Waste Management failed to accommodate him *because of* his lymphedema.  Instead of evidence of causation, Chapple relies on his arguments that Waste Management failed to provide a reasonable accommodation.  However, no inference of discrimination arises from the mere fact that Waste Management failed to reassign Chapple to the Scale Attendant or CSR positions.  Moreover, even if such an inference were warranted, Waste Management's policy of hiring the most qualified applicant is a legitimate, nondiscriminatory reason for not reassigning Chapple to those positions.  Chapple does not suggest that this reason was a pretext for discrimination.  Therefore, his disability discrimination claim can not survive summary judgment.

**C.      Failure to Accommodate**

The ADA and MHRA both require an employer to make reasonable accommodation to the known physical or mental limitations of a qualified disabled person unless the accommodation would impose an undue hardship on the employer.  See 42 U.S.C. § 12112(b)(5)(A); Minn. Stat. § 363A.08, subd. 6.  To establish a failure to accommodate claim, Chapple must "show that his employer knew of, and failed to reasonably accommodate, his disability." Kammueller, 383 F.3d at 784.  If no reasonable accommodation will allow a disabled employee to perform his current job, then "in certain circumstances, reassignment may be necessary as a reasonable accommodation." Cravens v. Blue Cross and Blue Shield of Kansas City, 214 F.3d 1011, 1018 (8th Cir. 2000); see 42 U.S.C. § 12111(9)(B) ("The term 'reasonable accommodation' may include . . . reassignment to a vacant position.").  The disabled employee "must 'satisfy the legitimate prerequisites for that alternative position, and . . . be able to perform the essential functions of that position with or without reasonable accommodations.'"

16

<u>Cravens</u>, 214 F.3d at 1019, <u>quoting</u> <u>Dalton v. Subaru-Isuzu Auto., Inc.</u>, 141 F.3d 667, 678 (7th Cir. 1998).  Reassignment generally is not required if it would violate "a legitimate, nondiscriminatory policy of the employer."  <u>Cravens</u>, 214 F.3d at 1020, <u>citing</u> <u>Dalton</u>, 141 F.3d at 679.

Chapple contends that Waste Management violated the ADA and MHRA by failing to reassign him to the vacant Scale Attendant or CSR positions.

**1.      Interactive Process Regarding Reassignment**

Chapple argues that Waste Management failed to adequately engage in an interactive process with him regarding reassignment.  "Although there is no per se liability under the ADA if an employer fails to engage in an interactive process," such a failure is *prima facie* evidence that an employer is acting in bad faith and raises a fact issue as to whether the employer attempted to provide a reasonable accommodation.  <u>Cravens</u>, 214 F.3d at 1021.  To show an employer's failure to engage in the interactive process, a disabled employee must establish that:

> (1) the employer knew about the employee's disability; (2) the employee requested accommodation or assistance for his or her disability; (3) the employer did not make a good faith effort to assist the employee in seeking accommodation; and (4) the employee could have been reasonably accommodated but for the employer's lack of good faith.

<u>Cravens</u>, 214 F.3d at 1021.

There is evidence that Chapple verbally communicated his work restrictions to Sartell. The record also shows that Chapple sought accommodation through reassignment to another position.  Chapple's interactive process argument fails as a matter of law, however, because the record does not support a finding that Waste Management failed to make a good faith effort to accommodate Chapple.  As evidence of a lack of good faith, Chapple cites the fact that Waste Management terminated him before obtaining a copy of his work restrictions.  However,

17

Chapple testified that he verbally communicated those restrictions to Sartell.  Chapple can not have it both ways—if, as Chapple argues, Waste Management knew about his lymphedema and his limitations, then Waste Management's failure to obtain a copy of those limitations does not show a lack of good faith.

Chapple also argues that Waste Management failed the good faith standard when it required Chapple to compete for the vacant positions rather than simply reassign him to one of the desired positions.  Walters and Klennert decided not to hire Chapple because each determined that other applicants were more qualified.  The Eighth Circuit Court of Appeals has yet to hold that an employer's policy of hiring the most qualified applicant for a job must give way when a disabled employee seeks reassignment to that job.  Therefore, Waste Management's consistent policy of hiring the most qualified applicant does not show a lack of good faith.

The record reflects Chapple sought reassignment and Waste Management notified him of two openings that might suit him.  Chapple, however, was not selected for either position, and was subsequently fired because Sartell determined that no openings were on the horizon.  The Court finds that the record does not support a finding that Waste Management failed to engage in the interactive process in good faith.

### 2.     Chapple's Qualifications for the Scale Attendant and CSR Positions

As discussed above, the record does not support a finding that Chapple was qualified for the Scale Attendant position.  However, there is a genuine issue of fact regarding whether Chapple was qualified for the CSR position.

### 3.     Waste Management's Legitimate, NonDiscriminatory Policy

Defendants argue that even if Chapple was qualified for the CSR position, Chapple's

failure to accommodate claim still must fail because Klennert followed Waste Management's policy and hired the applicant she determined was most qualified for each position.  In response, Chapple argues that once Klennert determined he was qualified, he was entitled under the ADA to be reassigned to the position.

The scope of the reassignment duty when it conflicts with an employer's policy to consistently hire the most qualified candidate has not been addressed by the Eighth Circuit Court of Appeals.  The Supreme Court in US Airways, Inc. v. Barnett, 535 U.S. 391, 394 (2002), held that absent special circumstances, a disabled employee is not entitled to reassignment when it would conflict with an employer's seniority-based transfer system.  The Court has not addressed whether a most qualified applicant policy will be accorded the same deference.  The Eighth Circuit has held that reassignment usually is not required if it would violate "a legitimate, nondiscriminatory policy of the employer."  Cravens, 214 F.3d at 1020 (citation and quotation marks omitted).

The courts of appeals are split on this issue.  Defendants rely heavily on the Seventh Circuit's decision in Equal Employment Opportunity Comm'n v. Humiston-Keeling, Inc., 227 F.3d 1024 (7th Cir. 2000).  There, a qualified disabled employee applied for reassignment, but other more qualified applicants were chosen.  Humiston-Keeling, 227 F.3d at 1027.  Affirming summary judgment for the employer, the Seventh Circuit held that "the ADA does not require an employer to reassign a disabled employee to a job for which there is a better applicant, provided it's the employer's consistent and honest policy to hire the best applicant for the particular job in question rather than the first qualified applicant."  Id. at 1029.  The Humiston-Keeling court held that reassignment would be mandatory only when "the reassignment is feasible and does not

require the employer to turn away a superior applicant." Id. at 1027.

The Tenth and D.C. Circuits have reached the opposite conclusion. See Smith v. Midland Brake, Inc., 180 F.3d 1154, 1167-68 (10th Cir. 1999) (en banc); Aka v. Washington Hosp. Ctr., 156 F.3d 1284, 1304-05 (D.C. Cir. 1998) (en banc).  In Smith v. Midland Brake, the Tenth Circuit held that "[i]f no reasonable accommodation can keep the employee in his or her existing job, then the reasonable accommodation may require reassignment to a vacant position so long as the employee is qualified for the job and it does not impose an undue burden on the employer." Midland Brake, 180 F.3d at 1169.  The Tenth Circuit further stated that "requiring the reassigned employee to be the best qualified employee for the vacant job, is judicial gloss unwarranted by the statutory language or its legislative history." Id.  Reaching a similar conclusion, the D.C. Circuit reasoned that "the ADA's reference to reassignment would be redundant if permission to apply were all it meant; the ADA already prohibits discrimination 'against a qualified individual with a disability because of the disability of such individual in regard to job application procedures.'" Aka, 156 F.3d at 1304, quoting 42 U.S.C. § 12112(a).  At least one district court in the Eighth Circuit has followed Midland Brake and Aka.  See Huber v. Wal-Mart Stores, Inc., No. 04-2145, 2005 WL 3690679 (W.D. Ark. Dec. 7, 2005).[7]

However, this Court finds that Chapple's reasonable accommodation claim fails as a matter of law.  The Eighth Circuit has clearly stated that reassignment generally is not required if it would violate a legitimate, nondiscriminatory policy that the employer has in place.  Cravens, 214 F.3d at 1020.  Additionally, the Court of Appeals has indicated, albeit in dicta, that "an employer is not required to make accommodations that would subvert other, more qualified

---

[7] Huber is currently on appeal before the Eighth Circuit.

applicants for the job." Kellogg v. Union Pac. R.R. Co., 233 F.3d 1083, 1089 (8th Cir. 2000).  In

the instant case, it is undisputed that Waste Management's most qualified applicant policy is a

legitimate, nondiscriminatory policy, and Chapple does not allege that the policy was

inconsistently applied.  Chapple asserts there is a fact issue as to whether he was more qualified

than the candidates chosen, but the record shows that Gibson and Struckman each had actual call

center experience and Chapple had none.

The Court is mindful that Congressional intent could be thwarted if an employer can

refuse to reassign a disabled person by always referring to a policy of hiring the most qualified

person for a job.  It is the province of employers, not courts, to determine which applicants are

most qualified for an open position.  See Stidham v. Minn. Mining and Mfg., Inc., 399 F.3d 935,

939 (8th Cir. 2005) ("[O]ur role is not to act as a super-personnel department second-guessing

business judgments.").  Often it will be easy for an employer to avoid reassigning a disabled

employee to a vacant job by claiming that another candidate is more qualified.  However, in this

case two facts are of special significance.  First, Chapple was less qualified based on an

important objective qualification; he had no call center experience whereas Gibson and

Struckman each had at least eight months of such experience.  Second, it is significant that a

bulk driver job requires an entirely different skill set than the CSR position does.  A bulk driver

must possess driving skills and the physical ability to maneuver the bulk items into the garbage

truck.  A customer service job primarily requires oral communication skills.  On these facts, as a

matter of law the ADA does not require that Chapple be reassigned from a driver position to an

unrelated customer service position when other candidates were objectively more qualified.

**4.      Potential Customer Service Representative Vacancies**

Chapple also argues that a fact issue exists regarding whether he should have been considered for potential CSR positions that Waste Management anticipated would become vacant within "a short period of time" as of the date he was terminated.  Monette v. Elec. Data Sys. Corp., 90 F.3d 1173, 1187 (6th Cir. 1996), quoted in Cravens, 214 F.3d at 1019 n.5. Chapple states that Waste Management hired "at least one or two more CSRs" in the months following his termination.  Am. Mem. in Opp'n to Mot. for Summ. J at 50.  This vague statement falls well short of showing that Waste Management anticipated a vacancy in late March 2004. "[E]mployers simply are not required to keep an employee on staff indefinitely in the hope that some position may become available some time in the future." Monette, 90 F.3d at 1187.  Here, Waste Management explored reassignment possibilities for Chapple for approximately two months from January 2004 through March 2004.  Chapple has not demonstrated a fact issue regarding whether Waste Management anticipated an imminent CSR vacancy when he was fired.

**IV. CONCLUSION**

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED** that Defendants Waste Management, Inc. and Waste Management of

Minnesota, Inc.'s Motion for Summary Judgment [Docket No. 23] is **GRANTED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.

BY THE COURT:


_____s/Ann D. Montgomery_____
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  February 28, 2007.

23